# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

JAMES RYAN BARBER,

      Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

      Defendant.

No. C12-0036

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   **PRINCIPLES OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.   *Barber's Educational and Employment Background* . . . . . . . . . . . 5
      B.   *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . 5
            1.   *Barber's Testimony* . . . . . . . . . . . . . . . . . . . . . . . 5
            2.   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . 9
      C.   *Barber's Medical History* . . . . . . . . . . . . . . . . . . . . . . 11

V.    **CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      A.   *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . 18
      B.   *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . 20
            1.   *Dr. Harding's Opinions* . . . . . . . . . . . . . . . . . . . . 20
            2.   *Barber's Subjective Allegations* . . . . . . . . . . . . . . . . 23
            3.   *Hypothetical Question* . . . . . . . . . . . . . . . . . . . . . 26

VI.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VII.  **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff James Ryan Barber on April 3, 2012, requesting judicial review of the Social Security Commissioner's decision to deny his application for Title XVI supplemental security income ("SSI") benefits. Barber asks the Court to reverse the decision of the Administrative Law Judge ("ALJ") and order the Social Security Commissioner ("Commissioner") to provide Barber SSI benefits. In the alternative, Barber requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On September 10, 2009, Barber applied for SSI benefits. In his application, Barber alleged an inability to work on a full time basis beginning December 1, 2006 due to ADHD, antisocial personality disorder, major depressive disorder, PTSD, and dissociative disorder. Barber's application was denied on December 21, 2009. On January 5, 2011, his application was denied on reconsideration.[2] On January 28, 2011, Barber requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 19, 2011, Barber appeared via video conference with his attorney before ALJ Jo Ann L. Draper for an administrative hearing. Barber and the vocational expert Vanessa May testified at the hearing. On November 23, 2011, the ALJ denied Barber's claim. The ALJ determined Barber was not disabled and not entitled to SSI benefits because he was functionally capable of performing his past relevant work as a kitchen helper. On January 4, 2012, Barber requested the Appeals Council review the ALJ's decision. On February 22, 2012, the Appeals Council denied Barber's request for review and adopted the ALJ's November 23, 2011 decision as the Commissioner's final decision.

---

[2] The record shows no clear reason for over a year passing between the initial SSI determination and the determination on reconsideration for Barber's application for SSI benefits.

On April 3, 2012, Barber filed this action for judicial review. The Commissioner filed an Answer on June 4, 2012. On August 2, 2012, Barber filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that Barber is not disabled and that he could perform his past relevant work as a kitchen helper. On October 1, 2012, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On October 12, 2012, Barber filed a reply brief. On June 14, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), after an administrative hearing, the Commissioner's decision not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive[.]"

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id*. (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence."

3

*Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court considers evidence supporting the ALJ's decision, and evidence detracting from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to

4

support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Barber's Educational and Employment Background

Barber was born in 1979. He left high school during tenth grade and earned his General Equivalency Degree in 2000. At the administrative hearing, Barber testified he had to take special education classes during elementary school, and during high school he worked with a special education teacher in addition to regular high school classes. Barber also testified he could speak and understand the English language, and that he could perform simple mathematics.

The record contains a detailed earnings report which covers Barber's employment history from 1996 to 2008. In 1996, Barber earned $433.60. He earned $2,579.94 in 1997. In 1998, Barber earned 2,529.29. He had no earnings from 1999-2002. From 2003 to 2006, he earned between $1,473.58 and $2,933.82. In 2007, Barber earned $314.65. He earned $115.29 in 2008. From 2009 to 2010, Barber had no earnings. Barber testified at the ALJ hearing in 2011 that he was currently working at Pizza Hut approximately eight to ten hours a week.

### B. Administrative Hearing Testimony

#### 1. Barber's Testimony

At the administrative hearing, Barber's attorney asked Barber why he believed he was unable to perform full-time employment. Barber responded "I feel like I'd do something wrong, . . . I would stop going to work or I'd have give[n] a bad work performance and get fired."[3] Barber also expressed concern that he would argue with his

---

[3] Administrative Record at 326.

boss. Also, Barber's attorney asked Barber if he had any physical disabilities. Barber responded that he did not have any physical disabilities.

Next, Barber's attorney asked Barber if he had any mental health problems. Barber replied that he had trouble "staying focused, and . . . remembering where I put my things at. Just dealing with depression."[4] Next, the ALJ asked Barber about his difficulty remembering things. Barber explained:

> I can remember how many steps my foster parents had in their house . . . but I can't remember what I have to work next week even though I check the schedule three or four times. I mean, I still have to call the day that I'm supposed to go into work and ask when I'm supposed to come in.

(Administrative Record at 313.) Next, Barber's attorney asked Barber to describe his dissociative disorder. Barber explained, "it [is] like your mind kind of splits and it's like . . . you're doing the things that you don't remember doing sometimes." *Id.* Specifically, Barber described an occurrence of his dissociative disorder:

> A: I was planning on going to a friend's birthday.
> Q: Where does the friend live?
> A: Off University in Cedar Falls[.] . . .
> Q: Okay.
> A: And I was coming from Independence Avenue[.] . . .
> Q: That's in Waterloo as well, correct?
> A: Yup. And I was planning on going to the birthday party, and I left with the intent to go there, and I ended up in Stout.
> Atty: Stout, Judge is a town about 15 or 20 minutes from Waterloo that doesn't look much like it's part of Waterloo. It's a very small rural community.
> A: And I kind of came to there, and I don't remember driving there. And it really scared me. I talked to Dr. Harding about it. And he said . . . that's part of the dissociated disorder.

---

[4] *Id.* at 312.

Q:    Is there someone who you know who lives in Stout?
A:    My foster parents do.

(Administrative Record at 314-315.) Then, Barber's attorney asked whether this was a common thing in his life. Barber responded:

> [T]hat's kind of an extreme situation, but at the same time there is -- I'll always forget where I put things. I'll always lose track of everything. I mean, if it wasn't for you know, Terry and my friend Beth, I probably wouldn't be able to make it to my appointments. I mean, no way [to] remember when they are.

(Administrative Record at 320.)

Next, Barber's attorney asked Barber to describe his sleeping habits. Barber explained, "I have like days where I can't fall asleep or I just sleep way too much, and I can't -- I can never seem to get on track. Like I can't find that balance."[5] Then, Barber's attorney asked Barber if he had problems with his personality changing. Barber responded: "Sometimes I get [mad] really quick over something that I thought was disrespectful. Sometimes I feel like . . . I can get really, really mad quick and then I'm okay with it after -- I get over it really fast, but it's like a light switch."[6] Next, Barber's attorney asked about Barber's anxiety:

Q:    And you have panic attacks; is that right?
A:    Anxiety attacks.
Q:    Anxiety attacks? How often do you have those?
A:    Kind of often. It depends on like, before today, I was like or today I was having an anxiety attack.
Q:    You were nervous about seeing --
A:    Yeah, I didn't know if I should --
Q:    I told you she wasn't scary.

---

[5] Administrative Record at 316.

[6] Administrative Record at 317.

A: Well, I didn't know if I should stand. I mean, I was just -- everything was kind of like racing through my head, you know, and -- I really have a hard time trying to explain the symptoms of what I'm going through, and I -- I feel like some times I sound like an idiot trying to explain it when I really don't know how to, you know, how I should do it.

Q: And what was the -- what were the symptoms of the panic attack?

A: Sweaty hands. Like, my heart was racing. Just feeling like I was gonna say the wrong thing or not like -- not give a clear answer and or get off topic.

Q: Okay. Do you think that people [are] out to get you, these bosses, were they out to get you?

A: At the time, I did. Some times I go back and forth. I mean, I think that -- I kind of -- I've kind of mellowed out, but I still have that anxiety when -- in the sort of -- where I want to challenge authorities sometimes.

(Administrative Record at 319.)

Lastly, Barber's attorney asked Barber about his depression:

Q: Have you ever thought of hurting yourself?

A: I have.

Q: How did you -- when? And how did you do that?

A: Like with a cutter.

Q: What do you mean you were a cutter?

A: I don't really cut so much -- I don't cut anymore, but . . . there's times when you -- you want to hurt yourself. But like I've tried cutting my wrist. I mean I did cut my wrist. And --

Q: It turns out that's a really hard way to kill yourself.

A: I didn't know it at the time.

Q: Yeah. Yes.

A: I tried hanging myself and I was really more self-destructive.

(Administrative Record at 321-22.)

## 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who has a:

> GED education, who has performed work in the past as a kitchen helper and inspector, hand packager. Now, this hypothetical individual has no exertional limitations. However, the hypothetical individual is limited to tasks that can be learned in 30 days or less involving no more than simple work-related decisions with occasional . . . workplace changes. This individual should have no more than occasional interaction with public and co-workers. This should be small groups of people and brief, superficial contact. . . . I'm also going to preclude this individual from performing work at a production rate pace[.] . . . And I consider production rate fast all the time as opposed to just fast during peak periods of an eight-hour workday.

(Administrative Record at 330-31.) The vocational expert testified that under such limitations, Barber could perform his past work as a kitchen helper. Next, the ALJ provided the vocational expert with a second hypothetical individual who in addition to the constraints placed on the first hypothetical individual, could not do any work as a kitchen helper. The vocational expert testified that under such limitations, the individual could perform a light, unskilled job as a laundry folder; a medium, unskilled job as a janitor; and a medium, unskilled job as a landscape laborer.

Furthermore, the ALJ provided the vocational expert with a third hypothetical individual who in addition the constraints placed on the second hypothetical individual, could only work at a slow pace for one-third of the work day. The vocational expert testified that the third hypothetical individual could not competitively perform the light, unskilled job as a laundry folder; a medium, unskilled job as a janitor; or a medium, unskilled job as a landscape laborer.

9

Next, Barber's attorney questioned the vocational expert:

Q:      If the person had a marked limitation where marked
        represented . . . distraction from job activity for more
        than 20 percent of the workday . . ., and their ability to
        remember locations and work-like instructions, would
        that preclude competitive employment?

A:      Yes.

Q:      And also if they were markedly limited as a previously
        indicated, and they were unable to understand and
        remember very short, simple instructions?

A:      Yes, that would preclude competitive employment.

Q:      And if they were limited so that between . . . 10 and 20
        percent of the time they were unable to perform work
        within a schedule, would that preclude competitive
        employment?

A:      Well, that would, most likely, be consistent with
        sheltered work. So, it would be not competitive.

Q:      And, . . . would the same apply if they were unable to
        make simple work-related decisions?

A:      Well, I guess, even unskilled work, you know, there
        are few decisions, but there may be some. So, if that
        was not -- if they couldn't do that on a 20 percent basis,
        then they would most likely not be able to complete the
        job?

Q:      Most likely not or would not be able to?

A:      Well, I would say it would preclude competitive
        employment.

Q:      Alright. I think we went through this in our last
        hearing, Ms. May.

A:      It's semantics.

Q:      It's not though when you're in Federal Court[.] . . .
        The Judge indicated in her first hypothetical only at
        occasional, superficial, brief contact with the public,
        co-workers and supervisors. And if the person were
        markedly limited in getting along with co-workers or
        peers without distracting them or exhibiting behavioral
        extremes and maintaining socially appropriate behavior
        and adhering to basic standards of neatness and

> cleanliness, in addition to the first hypothetical, would
> those two limitations preclude his past relevant work?
>
> A:     Yes.

(Administrative Record at 332-35.)

### C. Barber's Medical History

On August 4, 2008, Barber visited Dr. James Harding for an hour of individual therapy. Dr. Harding reported that Barber suffered from suicide ideation, PTSD and dissociation disorder. Dr. Harding noted:

> James had asked for a letter that he could present to court
> today; however, since we hadn't seen him for almost nine
> months we said we really couldn't honestly provide such a
> letter. James seemed to have no idea that it was anywhere
> near that long and we believe that his dissociation accounts for
> that.

(Administrative Record at 205.) Dr. Harding also noted that Barber's motivation is very low, and that Barber wanted a career, not a job. Dr. Harding noted that Barber is not eminently suicidal or homicidal.

On February 3, 2009, Barber visited ARNP Cyd Graft. Graft noted that Barber is not taking his prescribed psychological medicine because he cannot afford it. Graft reported that Barber is having trouble sleeping, and is irritable at a level of seven to eight out of ten, with ten being the most irritable, and he is happy at a level of zero out of ten, with ten being the most happy. Graft also reported that Barber has suicide ideation.

On February 23, 2009, Dr. Harding prepared a DSM-IV diagnosis sheet and assigned Barber a Global Assessment of Functioning (GAF) rating of 42 due to depressive disorder, PTSD, dissociative disorder, ADHD, antisocial personality disorder; and past alcohol, methamphetamine, and marijuana abuse.

On February 25, 2009, Barber visited Dr. Harding for an hour of individual therapy. Dr. Harding reported Barber had not visited in a long time, and that Barber had

"lost a lot of time." Next, Dr. Harding noted that Barber deals with depression and suicide ideation. Dr. Harding noted that Barber was not eminently suicidal or homicidal.

On April 7, 2009, Barber visited Dr. Harding for an hour of individual therapy. Dr. Harding noted that Barber worked on depression, PTSD, dissociation and OCD. Barber claimed to have significant memory problems, and Dr. Harding encouraged Barber to get a pocket notebook to write things down to help him remember important things. Harding noted Barber reported improvement in his emotions as a result of medicine prescribed to him.

On May 13, 2009, Barber drove to visit ARNP Cyd Graft. Graft noted Barber wanted to quit smoking so he could resume ultimate fighting, and Barber wrote a song his friend will sing in an acoustic guitar competition. Graft reported Barber is having trouble sleeping, and is irritable at a level of six to eight out of ten, with ten being the most irritable, and he is happy at a level of eight out of ten, with ten being the most happy. Graft noted Barber can concentrate for one to two hours, yet he loses his keys and wallet frequently. Also, Graft noted Barber cut his upper arm with a razor when he was nine or ten years old, and the last time he cut himself, he was twenty-five years old. Graft listed his current medications as Lexapro, Vistaril, and Seroquel.

That same day, Barber met with Dr. Harding. Dr. Harding noted Barber works on depression, PTSD, dissociative disorder, and a lot of reactive, defensive anger. Dr. Harding also noted Barber did not remember conversations with his girlfriend because the staff had those conversations with his girlfriend, not Barber. Dr. Harding reported Barber was adding emotional skill and was not suicidal.

On June 30, 2009, Barber drove to see ARNP Cyd Graft. Graft noted Barber could not sleep for the past two weeks, he has minimal paranoia, and is anxious about his relationship with his baby because the baby lives out of state with his married girlfriend. Graft also noted Barber's energy level is "all over the place," and his emotions range from

"content to upset and breaking down to furious to exhausted."[7] Also, Graft noted Barber continues suicide ideation and mentioned that on Saturday, Barber wanted to run his car off the road. Graft further noted Barber loses everything, and as a result, his mother makes him wear his key around his neck. In addition, Graft noted Barber was pacing at an increased level, he was irritable at a level of two to eight out of ten, with ten being most irritable, and he was sad at a level of two to eight out of ten, with ten being most happy. Graft noted that Barber gets mad and shaky, his hands tingle, and he gets edgy when he doesn't know people. Barber reported that he was in a fight in Anamosa, and he thinks he got knocked out. Graft's diagnosis consisted of depressive disorder, ADHD, anti-social personality disorder; and history of methamphetamine, marijuana, and alcohol abuse. Graft listed medications Barber used at the time as Lexapro, Vistaril, Seroquel, and Chantix.

On July 20, 2009, Barber visited Dr. Harding for an hour of individual therapy. Dr. Harding diagnosed Barber as having depression with suicide ideation, post traumatic stress disorder, and dissociative disorder. Dr. Harding noted Barber's medicines increased, his mind was racing, and Barber suggested he had not taken all of his medicine. Dr. Harding said Barber was not imminently suicidal or homicidal.

On December 18, 2009, Dr. Aaron Quinn, Ph.D., reviewed Barber's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique ("PRT") and mental residual functional capacity ("RFC") assessment for Barber. On the PRT assessment, Quinn diagnosed Barber with ADHD, depressive disorder, PTSD, antisocial personality disorder, dissociative disorder; and past alcohol, methamphetamine, and marijuana abuse. Dr. Quinn determined Barber had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining

---

[7] Administrative Record at 196.

social function, and moderate difficulties in maintaining concentration persistence, or pace. On the mental RFC assessment, Dr. Quinn determined Barber was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Dr. Quinn concluded Barber's activities of daily living indicate:

> problems with judgment and also interpersonal functioning, which is supported by the [medical evidence of record]. The claimant is also able to complete many functional activities although his mood and overall functioning fluctuate based on the evidence. . . . [T]he claimant's current level of functioning, although severe does not meet/equal listing level severity. The claimant is expected to have work-related difficulties with extended attention, detailed instructions, stress management, interpersonal functioning, judgment, and change. The claimant does, though, retain the ability to complete at least simple repetitive tasks on a sustained basis if he is able to work independent of others.

(Administrative Record at 234-5.)

On November 3, 2010, Dr. Harding's diagnostic impression of Barber was that Barber suffered from depressive disorder, anxiety disorder, PTSD, dissociative disorder, ADHD, learning disorder, and cognitive disorder. Dr. Harding further reported Barber does things he has no memory of, and Barber cuts himself. Harding assigned Barber a

GAF score of 50. Dr. Harding further noted Barber said he had not visited Dr. Harding for a couple of months, when it had actually been more than a year ago.

On November 18, 2010, Barber visited Dr. Harding for an hour of therapy. Dr. Harding noted James suffers from anxiety, PTSD, dissociation, depression, and relationship problems. Dr. Harding noted Barber reports having increased panic attacks, is getting lost, waking up in places, and he has male and female helpers internally. Dr. Harding noted Barber is not imminently suicidal, and assigned Barber a GAF score of 48.

On December 1, 2010, Barber visited Dr. Carroll Roland for purposes of a psychodiagnostic mental status disability exam upon referral from DDS. Dr. Roland reported Barber had not been seen by an ARNP or psychiatrist for more than a year. Dr. Roland noted Barber was early for his appointment and he was fully oriented to person, place and time. Next, Dr. Roland reported Barber's memory was intact, his thought process was goal directed, and he was not thinking about suicide, nor experiencing paranoia, delusions, hallucination, or first-rank symptoms. Dr. Roland further noted Barber's abstract thinking was intact, his speech was spontaneous, and his rate, volume and fluency of speech were normal. Dr. Roland further reports that according to the Beck Depression II inventory, Barber has severe depression. In summary, Dr. Roland determined Barber experiences major depressive disorder, PTSD, a history of dissociative disorder, and that Barber's memory and intellect are sufficient for entry level competitive employment. Dr. Roland assessed Barber's GAF at 55.

On January 4, 2011, Dr. Dee Wright, Ph.D., reviewed Barber's medical records and provided DDS with a PRT and Mental RFC assessment for Barber. On the PRT assessment, Dr. Wright diagnosed Barber with ADHD, major depressive disorder single episode, PTSD, dissociative disorder, antisocial personality disorder, and substance abuse in sustained remission. Dr. Wright determined Barber had the following limitations: mild

restriction of activities of daily living, moderate difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Wright determined Barber was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Dr. Wright concluded Barber's activities of daily living indicate:

> some cognitive limitations of function in this claimant's case. When unduly stressed, the claimant does exhibit variable sustained attention/concentration. During these times, the claimant would have difficulties consistently performing very complex cognitive activity that demanded prolonged attention to minute, complex details and rapid shifts in alternating attention. Despite these restrictions, the claimant is able to sustain sufficient concentration and attention to perform a range of non-complex, repetitive, and routine cognitive activities without significant limitations of function.

(Administrative Record at 259.)

On January 24, 2011, Barber met with Dr. Harding for an hour. Dr. Harding noted Barber suffers from depression, anxiety, PTSD, and dissociative identity disorder. Dr. Harding further notes Barber is not imminently suicidal or homicidal, but that he does hear inner voices. Lastly, Dr. Harding assigned Barber a GAF score of 48.

On March 10, 2011, Barber met with Dr. Chowdhry to review his medication. Dr. Chowdhry noted Barber denied any thoughts of self harm or harm to others, but he reports feeling anxious and not able to function well on the job. Last, Dr. Chowdhry assigned Barber a GAF score of 55. In April 2011, Dr. Chowdhry noted Barber has been "doing fairly well." Dr. Chowdhry again assigned Barber a GAF score of 55.

On April 26, 2011, Barber met with Dr. Harding. Dr. Harding noted that Barber suffers from depression, anxiety, OCD, anger, relationship problems, PTSD, and dissociative disorder. Dr. Harding further noted that Barber is self injurious and suicidal. Lastly, Dr. Harding assigned Barber a GAF rating of 50. In July 2011, Dr. Harding assigned Barber a GAF rating of 48.

On July 21, 2011, Barber met with Dr. Mueterthies for 30 minutes. Dr. Mueterthies noted Barber suffers from depression and anxiety. Dr. Mueterthies also noted Barber is a homeless referral. Dr. Mueterthies opined Barber should anticipate long term mental health treatment. Lastly, Dr. Mueterthies assigned Barber a GAF rating of 54.

On October 1, 2011, Dr. Harding provided Barber's attorney with medical impairment interrogatories establishing Dr. Harding had intermittent contact with Barber since Barber's childhood. Dr. Harding indicated Barber suffers from poor memory, sleep disturbance, significant personality change, mood disturbance, emotional lability, recurrent panic attacks, frequent psychomotor agitation, paranoia, feelings of guilt, time disorientation, social withdrawal, decreased energy, obsessions, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, somatization, and hostility. Further, Dr. Harding reported that Barber experienced a moderate restriction of activities of daily living, a marked difficulty in maintaining social functioning, constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and continual episodes of deterioration or

decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms.

On October 3, 2011, Dr. Harding provided a DSM-IV diagnosis for Barber. Dr. Harding reported Barber continues to suffer from depressive disorder, anxiety disorder, dissociative disorder, and ADHD. Dr. Harding reported Barber has no memory of doing things and he cuts himself. Dr. Harding assigned Barber a GAF score of 50.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Barber is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The five steps an ALJ must consider are:

> (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix"); (4) whether the claimant can return to [his or] her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.

*Moore*, 572 F.3d at 523 (citation omitted). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005), in turn quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).

In order to establish a disability claim, "[t]he claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3

(8th Cir. 2008)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to "show [that] the claimant is capable of performing other work." *Id*. In order to show that a claimant is capable of performing other work, the Commissioner must demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Barber had not engaged in substantial gainful activity since August 31, 2009. At the second step, the ALJ concluded from the medical evidence that Barber had the following severe combination of impairments: ADHD, depression with features of post traumatic stress, antisocial personality traits, and dissociative disorder. At the third step, the ALJ found that Barber did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Barber's RFC as follows:

> [Barber] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to a job that could be learned in 30 days or less that would require him to only make simple workplace decisions and have only occasional workplace changes. He would be able to have occasional and superficial interaction with the public and coworkers in no

> more than small groups of people. He could not do work at a
> production-rate pace; up to one-third of the day, he could work
> at no more than a fast pace.

(Administrative Record at 16.) Also at the fourth step, the ALJ determined that Barber would be able to do the work that he has done in the past as a kitchen helper. Therefore, the ALJ concluded that Barber was not disabled.

## B. Objections Raised By Claimant

Barber argues that the ALJ erred in three respects. First, Barber argues that the ALJ failed to properly consider the opinions of his treating doctor, Dr. Harding. Second, Barber argues that the ALJ failed to properly evaluate his subjective allegations of disability. Lastly, Barber argues that the ALJ provided a flawed hypothetical question to the vocational expert at the administrative hearing.

### 1. Dr. Harding's Opinions

Barber argues that the ALJ failed to properly evaluate the opinions of his treating physician, Dr. Harding. Specifically, Barber argues that the ALJ failed to indicate the weight she gave to Dr. Harding's assessments of Barber, and that the ALJ's reasons for discounting Dr. Harding's opinions are not supported by substantial evidence on the record. Barber concludes that this matter should be remanded for further consideration of Dr. Harding's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has

offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id..*); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear

to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In her decision, the ALJ addressed the opinions of Dr. Harding:

> Counsel obtained and submitted a mental impairment interrogatory form into the record from a treating psychologist. Reportedly, he has been seeing the claimant since he was a child but only on an intermittent basis. The psychologist nonetheless assessed the claimant as having multiple symptoms and limitations associated with various psychological disorders. He cited many functional limitations for the claimant of a serious to marked degree, to allow for a finding that his mental condition meets listing level severity. However, the document is not accepted as controlling on the issue of disability because the assessment is not supported by a longitudinal assessment of the record as a whole. For example, the assessment is contradictory to the findings and conclusions of the consulting psychologist whose report indicated a negative mental status examination and indicated that he would be able to do simple, routine work. The treating psychologist does admit to only intermittent contact with the claimant. The claimant has been reasonably active and would not be capable to do his level of daily activities if he had the high degree of those assessed limitations from the treating source. The claimant's testimony indicates that he currently lives independently with a roommate. He is able to go out to do the laundry, drives, engages in action TV, and plays with video games. As noted above, he is also able to get out and about when he has to in order to work as is apparently mandated by his probation; he was actually working at Pizza Hut at the time the treating psychologist completed [] the mental impairment form. The undersigned finds no good reason why the claimant could not elevate that work to the level of substantial gainful activity level if he was given the opportunity to do so. Moreover, the undersigned is convinced that the claimant would be able to do the work cited by the vocational expert at the time of the hearing, including work that he has done in the past and the other jobs that exist in

significant numbers in the state of Iowa and the national economy.

(Administrative Record at 18-19.)

Having reviewed the entire record, the Court finds the ALJ properly considered and addressed the opinion evidence provided by Dr. Harding. Also, the Court finds the ALJ provided "good reasons" for rejecting Dr. Harding's opinions. *See Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 301.

## 2.  *Barber's Subjective Allegations*

Barber argues that the ALJ did not properly evaluate the credibility of his subjective allegations about the intensity, duration and limiting effects of his condition. The Commissioner argues that the ALJ properly evaluated Barber's credibility because the ALJ considered Barber's treatment history, objective medical evidence and opinions, and Barber's daily activities. Barber replies that the ALJ did not explain why she believes Barber could increase his current job to full time status, and that the ALJ erred in considering Barber's daily activities when determining his credibility.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the

23

claimant's daily activities; (2) the duration, frequency and intensity of the issue; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions. *Id.* The ALJ is not required to methodically discuss each *Polaski* consideration, so long as she acknowledges and examines those considerations before discounting Barber's subjective complaints. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000).

If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

First, the ALJ considered Barber's subjective claims about his health:

> The claimant alleged at hearing that he has poor concentration, memory loss, loss of recall and/or periods of disorientation associated with a dissociative disorder. He noted that he

experiences episodes of irritability and anger. He claims to have sleep disturbance or times when he naps excessively. He feels uncomfortable around groups of people but in the work at Pizza Hut, he is around 2 other cooks, delivery drivers, managers and supervisors. He claims to have attacks of post traumatic stress where his heart races and he has racing thoughts. He finds himself isolative at times, not wanting to go outside. He indicated that his disorientation is not always an extreme situation. He enjoys playing x-box video games with friends. He admitted that Zoloft seems to be helping his depression. He feels frustrated sometimes at work but is pressed to keep working with the alternative being placement in a shelter or return to jail if he quit.

(Administrative Record at 17).

Next, the ALJ determined that Harding's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

It is clear from the ALJ's decision that she thoroughly considered and discussed Barber's treatment history, medical history, functional restrictions, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Barber's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Barber's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148.

Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. *Hypothetical Question*

Barber argues that the ALJ's hypothetical question to the vocational expert was incomplete because it did not account for all of the Barber's impairments. Additionally, Barber argues that it is unclear which hypothetical the ALJ adopted in the case.

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).").

Having reviewed the entire record, the Court finds that the ALJ thoroughly considered and discussed both the medical evidence and Barber's testimony in determining Barber's impairments.[8] The Court further determines that the ALJ's findings and conclusions are supported by substantial evidence on the record as a whole. Because the hypothetical question posed to the vocational expert by the ALJ was based on the ALJ's findings and conclusions, the Court concludes that the ALJ's hypothetical question properly included those impairments which were substantially supported by the record as

---

[8] *See* Administrative Record at 17-19.

a whole. *See Goose*, 238 F.3d at 985; *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible). Therefore, the ALJ's hypothetical question was sufficient.

## *VI. CONCLUSION*

The Court finds that the ALJ properly considered the medical evidence and opinions in the record, including the opinions of Dr. Harding. The ALJ also properly determined Barber's credibility with regard to his subjective complaints of disability. Lastly, the ALJ's hypothetical questions to the vocational expert properly included those impairments substantially supported by the record as a whole. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VII. ORDER*

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 6th day of March, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA